There were originally three counts in the bill of indictment: First, charging that the defendants set fire to and burned a certain building, the property of C.C. Mills; the second, that the defendant Yearwood burned the building, and that defendant Tabor aided and abetted him in it; and the third charge, willful injury to the property of C. C. Mills by setting fire to and burning certain sawed lumber. The defendants, at the close of the State's evidence, and again at the close of all the evidence, moved for judgment as of nonsuit against the State. The judge allowed the motion as to the first two counts, and refused it as to the last count. This refusal the defendants allege as error here.
The State's evidence tended to show that in 1916 the defendant Tabor bought from C. C. Mills the timber on Mills' land in Graham County, and Mills was to log it and deliver it at the mill for $7 per *Page 876 
thousand feet. Mills logged and Tabor sawed four mill-yards of the timber. The sum of $4 per thousand was to be paid when the logs were yarded, and the balance to be paid when the timber was sold. Tabor fell behind with his payments, and Mills accused (815) him of cheating in the measurements. They agreed to let one Boyd estimate the yard in question, and he found 191,000 feet on the yard, when Tabor had reported to Mills only 142,000. In the meantime, Tabor had sold the lumber to one Tatham, who had made payments to him on it. Tabor hauled out the first and second yards and sold them without paying Mills for them, and Mills told Tabor he was going to collect his money. Tabor proposed that he would pick out the best lumber, sell it, pay Tatham, then insure the balance, burn it up, get the insurance, and thus get his pay for poor stuff. Mills refused to have anything to do with the offer, and Tabor said: "It has been done, and it can be done again." Mills immediately went to Mr. Dillard, an attorney, and told him what Tabor had said, and, at the same time, started suit to collect his money, and had Tabor restrained from hauling the lumber off. That was in October, 1917. Tabor paid Mills $525, and agreed to haul out the balance of the lumber and pay Mills, but the lumber had to be carried nine miles over a rough mountain, and he hauled out only 40,000 feet and quit, and in the spring of 1918 Mills asked for the appointment of a receiver. A receiver was appointed, but Tabor again went to Mills and agreed to pay him, and the receiver did not qualify. Tabor did nothing about paying Mills, but on 1 May, 1918, he procured for himself $4,000 fire insurance on the lumber. In May notice was served on Tabor that on 3 June Mills would move at Robbinsville to have the judge appoint a permanent receiver, but on Saturday night, 1 June, both yards of the lumber, containing nearly a million feet, and separated by a ridge, were simultaneously fired and burned up. In the two yards there were about 150,000 feet of mill culls, two house patterns, and some wagon timber, owned by Mills, in which Tabor had no interest. Mills was in bed when his family discovered the fire, and he immediately went to the scene, but it was too late to save anything. He went to the homes of the neighbors and informed them to stay away from the yards. When he went to the home of the defendant, Swep Yearman, who lived with his parents, Yearman was in bed, and Mills saw him and talked to him. Swep Yearman's mother, in his presence, claimed that Swep had not been out of bed for two days, and protested that Swep was innocent, although Mills had not accused Swep, or any one else, of burning the lumber. Mills then placed guards at the lumber yards to keep people from spoiling the tracks, and set out to get *Page 877 
bloodhounds. On his way to Murphy he stopped at the home of Tabor, who lived across the mountain near Marble, waked him, told him of the fire, and tried to get him to help him get bloodhounds to trial the guilty party, but Tabor refused to do anything, and asked Mills to wait till the next day. Tabor had been at a lodge meeting at Marble that night, and had seen the light from the fire, and the first thing that occurred to him was that it was his lumber, but he made no investigation. Tabor promised to meet Mills (816) at Marble the next morning, and Mills went on to Murphy and phoned to Asheville for bloodhounds. He went back to Marble and got breakfast, but Tabor did not meet him there. He went home, got money to pay for the dogs, and went back to Marble to meet the train, and on the top of the mountain he met Tabor going towards the lumber camps. He again tried to get Tabor to help him about the trailing, but Tabor refused, and went on.
On Saturday afternoon, about dusk, and not long before the fire was discovered, Garfield Rhodes, who worked for Mills, was in the woods near the Chestnut Gap, looking after one of Mills' oxen which had its horn torn off. While there he saw Swep Yearwood going towards home in a hurry from the direction of the lumber yards. Yearwood did not follow the top of the ridge at the gap, but "circled off to one side" for some distance and went back to the top, and on toward home.
The bloodhounds were taken to the upper yard late Sunday afternoon, and struck a trail where a man's track was very plain, a No. 7 or 8 shoe. The dog trailed across the hill to the other burned yard, circled around there a while, picked up the trail, followed it across Chestnut Gap, where Rhodes had seen Yearwood, turned off from the top of the ridge just where Yearwood had gone. Tracks were visible where the dog trailed, and he went on down the ridge, around Yearwood's fence, through the gap, across the field, into Yearwood's house, passed the other beds, went up to the bed where Swep had slept the night before, jumped upon it with his forefeet, sniffed, smelled the pillow and quit trailing. There were several large logs in the trail coming down the ridge, and Swep, who had the mumps, had not climbed over any of them, but had gone around the ends, and when he had come to the fence he did not climb over it, but went around to the gap. The dog pursued the same course. Swep was not at home, but was up at the camp. Tabor had left the crowd as soon as the dog struck a trail towards Yearwood's, and the next time he was seen he was also at the camp where Swep was. Swep had been at work for Tabor for a long time, and was then in his employ. Before the dogs came that day, Pat Yearwood said, in Swep *Page 878 
Yearwood's presence, that all he hated about the dogs coming was that they would trail them to some of their houses. After the dogs had trailed to Yearwood's house and the people had started back across the mountain, Tabor took Mills aside and told him he had $4,000 insurance, of which 80 per cent was collectible, and that if he would hush and drop the matter where it was he would give him one-half of it.
A warrant was issued for Yearwood, but Tabor was not indicted till the grand jury met. Tabor kept Yearwood in his employ, furnished him money to go to the preliminary hearing before a justice at Robbinsville, went with him to the trial, and also had (817) counsel there to represent himself. Tabor kept Yearwood in his employ, and the two of them employed the same counsel for their defense, and Tabor stayed much with the Yearwoods, and they with him. Tabor received from Tatham advancements of $8 per thousand on the lumber, and he had paid Mills $4 per thousand, and had used the other $4 to pay for sawing it. He had put no money into it himself, and whatever he could have gotten out of the insurance company would have been clear money. The above testimony relates to the motion for a nonsuit.
Other exceptions relate to the admission of evidence, as to the acts of the bloodhound which was put upon the trail of the defendant Yearwood. The defendant contended that the State failed to lay a proper foundation for such evidence, and that the dog had failed to identify Yearwood as the criminal. The witness Dillingham testified:
"I live in Asheville and am a plain-clothes policeman. Some dogs are kept in Asheville by Chief of Police John Lyrle. I brought the dog, Joe, out here. He has been in Asheville for about two years or a little longer, and I have been handling him myself a little over twelve months. He is an english bloodhound. I have used him on about ninety cases since I have handled him. He will trail nothing but a human being. If I set him on the track of a human being he will not change from one track to another, at least he never has since I have been handling him. I have run eighty-six or eighty-seven cases with him."
The owner of the property destroyed at once put guards about the burned yards to prevent outsiders from confusing the tracks of the criminal. The fire had "run" over the fallen leaves about the yards some twenty or thirty steps. When Dillingham came with his dog, he found a well-defined track in a damp place near the margin of the burnt place. He put his dog on that and he pursued the trail to the other burned mill, took it up there again, and carried it to *Page 879 
the house of O. P. Yearwood, the father of the defendant Swep. The track at the starting point, where it was fully defined, was measured. The last track measured along the trial was in Yearwood's field, in about a hundred and fifty yards from his house. This agreed with the first measurement. Garfield Rhodes, a witness for the State, had observed the defendant, Swep Yearwood, at Chestnut Gap the afternoon immediately preceding the fire. "When I first saw him," said he, "he was coming from the lumber, trotting or walking. I don't know whether he saw me or not. This was between sundown and dark. When I saw him he turned to the left." The dog followed along this trail and turned off where Swep turned off. Swep was suffering from the mumps that night, and Mills stated, "During the tracking the dog trailed by logs across the trail. There was something like three or four of them, and the dog went around the ends of them." The following is Mills' account of what the dog did when (818) they arrived at Yearwood's house:
"When we got to the house Mr. Yearwood and Mrs. Yearwood were sitting on the porch. We went up to them and he went along smelling the floor into the house, and scented these beds as he came along until he came to the third bed, and scented good at that, and reared up and smelled the cover of the bed and ran his nose down the pillow as many as three times, and made a sniffing noise with his nose. This was the bed I saw Swep in the night before."
Dillingham stated: "At the house Mr. Mills said he was satisfied, and I went down to the branch and got some water, and had no more dog work. We loaded the dog back in the wagon and carried him across the mountain. He would not have paid any attention to the man we had been trailing after we loaded him into the wagon."
Mills and Birchfield testified to a conversation with Swep a day or two after the burning, in which Swep said: "I understand I burned your lumber"; and further stated, "I had a hard time burning those two yards and running around the hillside and going into the house." Birchfield testified in the same conversation, and immediately on making this statement, that Swep said "he was as clear as me or Mills."
There are some exceptions to evidence to be noticed hereafter.
Defendants were convicted, and appealed from the judgment.
after stating the relevant facts as above: The evidence in this case was certainly sufficient to be considered by the *Page 880 
jury upon the issue as to defendant's guilt, and the motion for a nonsuit was properly disallowed. The question as to the competency of testimony about the trailing of a person suspected of guilt by bloodhounds has been thoroughly well settled by this Court, and we have held that, under certain conditions, such evidence is admissible. The dog which trailed this defendant proved his own reliability. The subject is fully treated in S. v. McIver, 176 N.C. 718, and cases therein cited. A case which comes very near to a perfect likeness of this one is Richardson v. State, 145 Ala. 46, where it was held that, under proper conditions, it is permissible for the purpose of connecting a defendant with a crime, to admit evidence, along with the other circumstances, that dogs trained to track human beings were put on the trail at the scene of the crime, where circumstances or evidence tend to show the defendant had been, and that after taking the trail they went thence to a point where defendant is shown to have been after the commission of the act. Where such (819) evidence is proposed to be introduced, it would, of course, be proper to allow a witness, familiar with the dogs and accustomed to handling them, to testify that they are skilled in the trailing or tracking of men, and within what time, after the making of tracks, the dogs would take up and follow the trail. The court committed no error in allowing the witness Townsend to testify along these lines, citing Hodge v. State, 98 Ala. 10; Simpson v. State,111 Ala. 6; Little v. State (Ala.) a. 432. Hodge v. State, supra, is also much like the case at bar. Justice McClellan there said: "We are of the opinion that the fact that the dog, trained to track men, as shown in the testimony, was put on the tracks at the scene of the homicide, and, `taking the trail,' so to speak, went thence to defendant's house, where he, the defendant, is shown to have been that night after the killing, was competent to go to the jury for consideration by them, in connection with all the other evidence, as a circumstance tending to connect the defendant with the crime; and, of consequence, that the court committed no error in refusing to exclude it." In Parkerv. State, 108 Am. St. Rep. 1021, it was held that if a human track, assumed to be that of the person accused of crime; and which the circumstances in evidence tend to show was his track, was pointed out to the bloodhound trained in trailing human tracks, and such dog trailed the track from where it was pointed out to him to the residence of the accused, some mile and one-half away, and the course of his pursuit of such track was followed by witnesses, who testified that the dogs followed this same track, which they described, evidence of these facts is admissible as showing a circumstance connecting the accused with the crime. On the trailing of one *Page 881 
accused of murder, whose tracks have been followed by a bloodhound, a witness is competent to state his knowledge of, and experience with, such dog as being an animal trained and used for the purpose of running down human beings. A case of prominence in this branch of the law, and frequently cited, is Pedigo v. Com.,103 Ky. 41 (44 S.W. 143), where it was held that testimony as to trailing by a bloodhound is admissible, where it is established by the testimony of some person who has personal knowledge of the fact that the dog in question has acuteness of scent and power of discrimination, and has been trained or tested in the tracking of human beings, and it appears that the dog so trained and tested was laid on the trail, whether visible or not, at a point where the circumstances tend clearly to show that the guilty party has been, or upon a track which such circumstances indicate to have been made by him. The same Court held, in Denham v. Com., 119 Ky. 508, that in a prosecution for crime, evidence of the trailing of defendant by bloodhounds, which were shown to have been of good breeding, and to have been carefully trained in tracking men, and which had tracked and aided in the capture of many criminals, was admissible, although the pedigree of the dogs were not asked about or stated (820) with particularity.
The Court said, in Davis v. State, 46 Fla., pp. 137-140: "The adjudged cases on this point are few, but uniform in admitting such evidence under proper conditions. But in order that such testimony be admissible, there must be preliminary proof of such character as to show that reliance may reasonably be placed upon the accuracy of the trailing attempted to be proved. There should first be testimony from some person who has personal knowledge of the fact that the dog used has an acuteness of scent and power of discrimination, which have been tested in the tracking of human beings. The intelligence, training, and purity of breed are all proper matters for consideration and determining the admissibility of such evidence, as is also the behavior of the dog in following the track pointed out," citing authorities.
We have referred to the above cited authorities specially, because their facts are so analogous to those of the case in hand. But the principle is so well settled in this State that it is much too late now to question it. The evidence here fully complies with the rule of admissibility, as stated by us. There is evidence that the dog which was set on the trail was an English bloodhound of established reputation, and had been trained and handled by its owner in a large number of cases where human beings had been trailed. The conduct of the dog was somewhat remarkable, and indicated that he *Page 882 
was competent and well fitted for the pursuit in which he was employed. The defendant, Swep Yearwood, had evidently been at one of the yards on the evening of the fire, and was seen by others on his way back to his home. He was not traveling the ordinary and usual route, near the gap, but deviated therefrom, and when he came to logs he did not step over them, but went around the ends, and the dog pursued the identical course when trailing him, showing that his scent was keen and discriminating. He then followed his tracks to his home, and to that part of the bed in which he had slept the night before, and showed by his action and conduct that he had found this as his last resting place. The defendant was not pursued further because the dog's owner, and trainer, deemed it unnecessary. We do not say that this testimony was at all conclusive, but it disclosed facts and circumstances sufficient for the consideration of the jury in connection with the other evidence in the case, and as corroborative thereof. S. v.Moore, 129 N.C. 494, and S. v. Norman, 153 N.C. 592, relied on by defendant, are materially different from the decisions cited by us, and from this case, and do not apply.
The motion to nonsuit was properly overruled as to both defendants, because there was evidence for the jury upon the question of guilt. The circumstances connecting Tabor with the commission of the offense were sufficiently strong for submission to the jury.
We have reviewed carefully the questions of evidence, (821) and find no error in the judge's rulings in regard to it. What was said by Yearwood's mother and sister was but a part of a conversation between them, C. C. Mills, and Swep Yearwood. The latter must have understood the significance of it, and that it was calculated and intended to produce the impression upon Mills that Swep was innocent because he had been confined to his bed for two days and nights, and therefore could not have been at the wood, or lumber, yards. Mills asked the defendant if he had been in bed, and he replied that he had. He was seen late that afternoon coming from the lumber yards and going to his father's house. This apparent deception on his part was relevant to the issue, because it was a circumstance tending to show guilt. He was pretending to be innocent by impliedly asserting an alibi, when there was evidence that there was no alibi, as he had actually been seen away from his home and returning to it that afternoon. We considered a similar question inS. v. James Lewis, 177 N.C. 555, and it was there held that where a prisoner and his witness have testified, for the purpose of proving an alibi, that he was sick in bed for a period of time extending over two weeks, including the day on which the rape was committed, for which he was being tried, it is competent, in order to contradict these *Page 883 
statements, for the State to show that during that time he was several times seen apparently well and going about at other places. The defendant in this case can hardly be heard to deny that his conduct on this occasion was a virtual representation that he had been sick and in bed during the period covering the afternoon on which the burning of the lumber occurred.
Unanswered questions are not legitimate subjects of exceptions, unless it appears what was expected to be proved, or, in other words, what the answer would have been if it had been admitted by the court. It would be useless to send a case back for a new trial for such alleged errors as the witness, when again questioned, may say that he knows nothing about the matter, and if so, our labor will have been in vain, and worse it would be, for we would have uselessly prolonged litigation. This kind of exception has frequently been disallowed. It is said in Gibson v. Terry, 176 N.C. 533: "There is another reason why the exception cannot be sustained. While the question indicates what the defendant was endeavoring to prove, it does not appear in the case on appeal what the witness would have testified to. He might have answered `Yes' or `no.' In Knight v. Killbrew, 86 N.C. 402, the Court says: `It is a settled rule that error cannot be assigned in the ruling out of evidence unless it is distinctly shown what the evidence was in order that its relevancy may appear, and that a prejudice has arisen from its rejection.'" Justice Allen cites Knight v. Killbrew, supra, and approves the quotation therefrom in Stout v. Turnpike Co., 157 N.C. 367.
There are several other exceptions to evidence, but it is so apparent they were not well taken we will not discuss (822) them, as it would protract the opinion beyond its proper limits without any corresponding benefit.
We have carefully scanned the record, and no error is found.
No error.
Cited: S. v. Robinson, 181 N.C. 518; S. v. Ashburn, 187 N.C. 722; S.v. Redfern, 246 N.C. 298; S. v. Rowland, 263 N.C. 359.