## STATE v. FRANK ROWLAND.

### (Filed 15 January, 1965.)

**1. Criminal Law § 101—**

A general motion to nonsuit is properly overruled if there is evidence sufficient to support a conviction of the crime charged or of an included crime.

**2. Robbery § 4—**

Evidence tending to show that the victim of a robbery was left unconscious from a blow inflicting a wound in the back of her head requiring eight stitches to close and causing her to be hospitalized for two weeks, is sufficient to show that the robbery was committed by the use of a dangerous weapon, since the dangerous character of the weapon may be inferred from the wound. G.S. 14-87.

**3. Criminal Law § 101—**

Where the State relies upon circumstantial evidence, defendant's motion to nonsuit presents only the question whether a reasonable inference of defendant's guilt may be drawn from the circumstances adduced by the evidence, it being for the jury to determine whether the facts, taken singly or in combination, satisfy the jury beyond reasonable doubt that defendant is actually guilty.

**4. Criminal Law § 44—**

Where a dog is identified as a "bloodhound" and a "thoroughbred," and it is shown that the dog actually followed a single human scent, differentiating it from others, objection that it had not been shown that the dog was of pure blood is untenable.

**5. Same—**

Where the evidence discloses that a bloodhound followed tracks from the scene of the crime to a room of a house some distance away in which the defendant and another were sitting, with evidence tending to show that defendant had on his person bills of the same denomination as those taken from the unconscious body of the victim of a robbery, objection to the evidence of the actions of the dog because the dog did not sufficiently identify defendant at the end of the trail is untenable.

**6. Robbery § 4—Circumstantial evidence of defendant's guilt of robbery with a dangerous weapon held sufficient to be submitted to the jury.**

Evidence tending to show that the occupant of a house went to investigate a noise in the house, that while doing so she was rendered unconscious by a blow to the head, that defendant had been on the premises a short while previously, that defendant had been penniless the day before, that later on the same afternoon defendant purchased shoes and whiskey and that night, when approached by a deputy, attempted to conceal in the cushions of the sofa on which he was sitting bills of the same denomination as those taken from the victim, *held* sufficient to be submitted to the jury on the question of defendant's guilt, irrespective of evidence that defendant was trailed by a bloodhound from the scene of the crime to the place where

apprehended by the deputy, and, under the circumstances, the evidence in regard to the actions of the bloodhound being merely explanatory of the deputy's timely arrival, its admission was not prejudicial.

**7. Criminal Law § 162—**

Where there is sufficient competent evidence to overrule defendant's motion to nonsuit, the introduction of other evidence, even if incompetent, is not prejudicial when such evidence does not in itself tend to link defendant with the *corpus delicti* and it is apparent from the whole record that its admission did not affect the result adversely to defendant.

APPEAL by defendant from *Carr, J.*, April 1964 Criminal Term of ROBESON.

At the November Term 1959, defendant was convicted upon a bill of indictment charging that on September 23, 1959, with the use of a dangerous weapon, *a large club or blunt instrument,* he feloniously took from the person of Maggie Hunt three hundred dollars. Thereafter the sentence imposed was vacated because defendant had not been represented by counsel, and defendant was tried *de novo* at the April Term 1964.

The State's evidence tends to establish these facts: Between 3:00 and 4:00 p.m. on September 23, 1959, Maggie Hunt, a seventy-six-year-old woman, was alone at her home. In a moneybag tied round her waist under her clothes, she had two one-hundred dollar bills and some fives and tens, "a little over three hundred dollars in all." That afternoon, as he had done regularly since January, when he was shot in the right hand and lost a finger, defendant came to the door of her home with a jar and a paper bag to beg for food. Into the jar Mrs. Hunt put milk she had just churned and into the bag, food. She handed both to him from the door. She then went to her front porch and sat down for ten or fifteen minutes. Hearing a racket in a back room, she went inside to investigate. Until she came to in the hospital, where she remained for two weeks, the last thing Mrs. Hunt remembers is standing with her back to the kitchen door. About sundown her daughter-in-law found her sitting, with her head down, in a chair on the front porch. She was unconscious and bleeding from her nose and from a wound in the back of her head. It required eight stitches to close the wound. Her money was gone. There was blood on the floor in the room next to the kitchen.

Deputy Sheriff Thompson came to the house shortly after dark. In the backyard, in soft dirt, he found distinctive tracks. "One side of the foot had a few little ridges on it, the rest of the shoe was worn slick and there were two round holes in the track in the bottom of each shoe. The side of one of the shoes had some tread on it and the other

side slick. The other shoe was worn slick. The tracks led from the back of Maggie's home into the corn field." Deputy Sheriff Thompson went home and got the bloodhound which he had acquired from prison authorities four years previously and which he described as follows:

> "At that time the bloodhound was a pretty old dog. He was a thoroughbred. He had been trained to tracking the human scents and human bodies. I had been using him four years myself for the purpose of tracking human scents. I have used him to track a lot of people. I would say seventy-five or a hundred. The dog was reliable in tracking human scent. . . . (T)hat is all he would ever run, that was human scent . . . (he) had been trained by the State and prison camp."

According to Deputy Thompson, the dog had the ability to discriminate between different human scents. He put the dog on the tracks at the edge of the yard. With reference to succeeding events he testified:

> "I trailed him on down through the cornfield, hit a sandy spot in the cornfield and this same set of tracks, with holes in the bottom of the shoes, and walked this sandy strip, crossed a streak of woods into a pasture, went through the pasture, and went under a barbed wire fence into a highway, crossed the highway to the left-hand shoulder, went to the right down the highway about two hundred yards, crossed the highway back in front of Wesley Carter's wife's home, where she lives, went up in the yard, and the dog went up the front steps. I knocked on the door and Wesley's wife said, "come in." I pushed the door open. She was sitting across the room to the left of the door. Frank Rowland was sitting on a long sofa. The dog went into the house with me. . . .
>
> "When I walked in I noticed Rowland, he pulled his hand out of his left pocket and slipped it down under him like, to the side. I went to him, got him up and searched him, and where he was sitting, where he put his hand, I found two one-hundred dollar bills and eighteen or nineteen other dollars, there was five, ten and ones. In the right-hand pocket he had one fifty cents and three quarters and I believe a nickel or dime in the right-hand pocket."

Wesley Carter's wife, Earline, disclaimed any knowledge of the money. Defendant said it was not his, and he could not explain where he got it. Defendant was wearing a new pair of shoes — not the ones which made the tracks the dog had followed. The day before, defendant, wearing old tennis shoes, had told Deputy Thompson that he needed some shoes and clothes and asked him for work. When ques-

tioned about the new shoes, defendant told the deputy that he had bought them late that afternoon in Rowland and had put his old ones in a trash can at Annie Washington's place. There the officer found a pair of rubber boots, cut off at the ankles, which he had seen defendant wearing. About 9:00 p.m. defendant was arrested and charged with robbing Maggie Hunt with the use of a dangerous weapon. The next morning the deputy went to Wesley Carter's home, where defendant lived and which is about five hundred yards from Mrs. Hunt's place. He testified:

> "I went in a room in Wesley Carter's home and this pair of shoes that I was trailing, tennis shoes I call them, was sitting under Rowland's bed, had two round holes in the soles, and some ridges on the right shoe. I compared them with tracks I had followed the day before. They compared exactly the same. I talked with Rowland and he said that was his shoes."

Wesley Carter and his wife lived in homes about one mile apart. Wesley permitted defendant to live in his home because he "did not have any place to stay . . . and he didn't have anything to pay with." When the deputy put his dog on the tracks at the edge of the field, the dog went straight from the Hunt home to the home of Earline Carter without ever going near Wesley Carter's home. The record does not disclose the distance from the Hunt home to Earline Carter's house, but it took the dog between thirty-five and forty minutes to lead the deputy there.

Defendant did not testify. He put on four witnesses, the testimony of two of whom tended to establish an alibi, placing him at the time in question at Annie Washington's place, where, defendant told the officer, he had purchased a pint of liquor. Earline Carter, testifying as a witness for defendant, said that he came to her house fifteen or twenty minutes ahead of Deputy Thompson; that she had been away from home between 1:00 and 4:30 p.m. and her house was locked during that time; that the deputy found defendant "sitting on the money" at her house; that the money was not hers; that nobody but defendant had come to her house after she got home that evening; and that she knew defendant had no money of his own. (Of this money, $223.00 was returned to Maggie Hunt.)

The jury returned a verdict of guilty as charged. From the sentence imposed defendant appeals.

*Attorney General Bruton, Deputy Attorney General Harry W. Mc-Galliard, Assistant Attorney General Richard T. Sanders and Staff Attorney L. P. Hornthal, Jr., for the State.*

*Watts & Gardner for defendant.*

SHARP, J. Defendant's appeal presents two questions: (1) Was defendant's motion for nonsuit properly overruled? (2) Did the court err in admitting evidence of the action of the dog, with which, according to the State's evidence, the deputy sheriff tracked defendant?

Even if the bloodhound evidence were eliminated, the remaining evidence was, taken in the light most favorable to the State, sufficient to establish these facts: Three hundred dollars (two one-hundred dollar bills and others of smaller denomination) was taken from the person of Maggie Hunt while she was unconscious from a blow. An unseen assailant had inflicted the blow within minutes after Mrs. Hunt had heard a noise inside of the house and while she was investigating it. Defendant had been on the premises fifteen minutes previously, begging food. He had been penniless the day before and had been wearing the tennis shoes with holes in them. The afternoon Mrs. Hunt's money was taken, defendant purchased, among other things, shoes and whiskey. That night, when the deputy entered the room where defendant was, defendant attempted to conceal between the cushions and the coverlet of the sofa on which he was seated two one-hundred dollar bills and eighteen or nineteen dollars in smaller bills. The only statement he made was that the money was not his.

The crime of which defendant was charged and convicted was robbery with the use of a dangerous weapon, to wit: a large club or blunt instrument. It is defendant's contention that his motion for nonsuit should have been allowed because, *inter alia,* there is no direct or positive evidence that Mrs. Hunt was struck with any dangerous weapon, namely a club or blunt instrument. Defendant's motion for nonsuit was general. He did not specifically move to dismiss the charge of armed robbery. "A motion for judgment as of nonsuit addressed to the entire bill is properly overruled if there is evidence sufficient to support a conviction of the crime charged or of an included . . . crime." *State v. Virgil,* 263 N.C. 73, 75, 138 S.E. 2d 777, 778; *accord, State v. Johnson,* 227 N.C. 587, 42 S.E. 2d 685. An indictment under G.S. 14-87 includes common-law robbery. *State v. Wenrich,* 251 N.C. 460, 111 S.E. 2d 582. Palpably, the State's evidence in this case would support a conviction of common-law robbery. *State v. Lawrence,* 262 N.C. 162, 136 S.E. 2d 595. We think the State's evidence equally potent to establish robbery with the use of a club or other blunt instrument. "The dangerous or deadly character of a weapon with which accused was armed in committing a robbery may be established by circumstantial evidence." 77 C.J.S., *Robbery* § 47c (1952). In *People v. Sampson,* 99 Cal. App. 306,

278 P. 492 (3d Dist. Ct. of Appeals), a case in which the defendant was convicted of robbery, the victim was struck from behind. In sustaining a conviction the court said:

> "Having been rendered immediately unconscious by the blow, and not having seen in advance the instrument with which he was struck, the witness could not know what weapon was used. The character of weapon used by the defendant may be shown, of course, by circumstantial evidence, and proof that the victim was rendered unconscious by the blow and remained in that condition for a considerable time, together with the nature of the injury inflicted, warrants the inference, in the absence of other evidence, that a dangerous weapon was used." *Id.* at 309, 278 P. at 493.

In *People v. Liner*, 168 Cal. App. 2d 411, 335 P. 2d 964 (4th Dist. Ct. of Appeals), the court held that the jury could infer, from the appearance of the wound in the back of the victim's scalp, that a blunt object, which was a dangerous or deadly weapon, was used. Here, Mrs. Hunt, the victim, was rendered unconscious by a blow which, leaving a wound requiring eight stitches to close, caused her to be hospitalized for two weeks. The only reasonable inference is that a dangerous weapon was used.

When the motion for nonsuit calls into question the sufficiency of circumstantial evidence, the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty. *State v. Thompson*, 256 N.C. 593, 124 S.E. 2d 728; *State v. Bright*, 237 N.C. 475, 75 S.E. 2d 407. The chain of circumstantial evidence in this case was clearly sufficient to establish both the *corpus delicti* and that defendant was the perpetrator of the crime. Thus, it was sufficient to overrule defendant's motion for nonsuit.

Defendant next contends that he is entitled to a new trial because the bloodhound evidence was both incompetent and prejudicial.

In *State v. McLeod*, 196 N.C. 542, 146 S.E. 409, a case in which bloodhound evidence was held incompetent and prejudicial because the action of the dogs afforded no reasonable inference of identity of the prisoner as the guilty party, Stacy, C. J., said:

> "It is fully recognized in this jurisdiction that the action of bloodhounds may be received in evidence when it is properly shown: (1) that they are of pure blood, and of a stock character-

ized by acuteness of scent and power of discrimination; (2) that they possess these qualities, and have been accustomed and trained to pursue the human track; (3) that they have been found by experience reliable in such pursuit; (4) and that in the particular case they were put on the trail ot the guilty party (who) . . . was pursued and followed under such circumstances and in such way as to afford substantial assurance, or permit a reasonable inference, of identification." *Id.* at 545, 146 S.E. at 411.

Defendant argues that the State did not lay a proper foundation for the bloodhound evidence in that it failed to establish either that Deputy Thompson's dog was of pure blood or that, at the end of the trail, the dog identified defendant with reasonable certainty — requisites (1) and (4) as set out above in *McLeod.*

With reference to the first requisite, the deputy described his dog as "a bloodhound" and "a thoroughbred." "The terms *thoroughbred, full-blood,* and *pure-bred* are generally used in this country as practically synonymous." 3 Dictionary of American English 1861 (1942 Ed.). In *State v. Wiggins,* 171 N.C. 813, 89 S.E. 58, identification of the defendant by "bloodhounds brought from Tennessee" was admitted. In *State v. Yearwood,* 178 N.C. 813, 101 S.E. 513, the admission of evidence of identification by a dog described only as "an English bloodhound" was approved. In practice, if the dog has been identified as a bloodhound, it has been the conduct of the hound and other attendant circumstances, rather than the dog's family tree, which have determined the admissibility of his evidence.

We find no North Carolina cases, and defendant has cited us to none, in which bloodhound evidence has been excluded for a deficiency in the proof of the bloodhound's pedigree *if* he is shown to be naturally capable of following the human scent, *i. e.,* that he is a bloodhound, *and if* the evidence is corroborative of other evidence tending to show defendant's guilt. See Annot., Evidence of trailing by dogs, 94 A.L.R. 413, 419. In *State v. Yearwood, supra* at 818, 101 S.E. at 516, Walker, J., said: "The dog which trailed this defendant proved his own reliability." So, also, it seems to us, did the deputy's dog. The performance of this "pretty old" dog without any papers puts him in a class with the young horse which was the subject of many a chapel talk to his boys by famed old schoolmaster William Robert ("Old Sawney") Webb at the Webb School in Bellbuckle, Tennessee. His story was that when a young horse of obscure lineage (no registration papers) won the derby in a record-breaking burst of speed, horse fanciers began scouring the country for his sire, dam, and siblings. This young stallion, ac-

STATE *v.* ROWLAND.

cording to "Old Sawney," had "pedigreed his ancestors," and that was all that the schoolmaster demanded of his boys. By his performance, the old dog in this case pedigreed himself, at least. This record leaves little doubt that the shoe prints which he had followed from Maggie's to Earline's belonged to defendant.

It is true that the evidence is silent as to what the dog did when he and the deputy arrived at Earline Carter's. She said that the officer tied the dog outside and never brought him into the house. The deputy said that the dog went in with him, but counsel for neither the State nor defendant inquired into the dog's actions inside the house. They, as we, probably considered the dog's conduct at the end of the trial immaterial when, there, the deputy found defendant sitting on a cache of money, which included two one-hundred dollar bills. Such a circumstance ordinarily would satisfy the fourth requisite given above in *McLeod*. See *State v. Norman*, 153 N.C. 591, 595, 68 S.E. 917, 918. We conclude that the bloodhound evidence is not incompetent for failure to comply with *McLeod*. If, however, defendant had been found at the end of the trail without the hundred-dollar bills, the evidence would undoubtedly be incompetent. The law of probability makes it as certain as anything in life can be that the bills belonged to Maggie Hunt; under these facts it made no difference whether the dog bayed defendant.

The feat of the dog in following defendant's tracks from Maggie Hunt's to Earline's furnished, in itself, no relevant evidence, under the facts of this case, that defendant was the robber, *i. e.*, no relevant evidence linking defendant with the *corpus delicti*. It is irrelevant that defendant's tracks led from Maggie's house, for he had been there earlier to beg, a lawful mission. That defendant was present at Earline's house *at the time the dog arrived there* was clearly a coincidence. Since, *coincidentally*, defendant happened to be at Maggie's with the money, we think the admission of the evidence, if error, was not prejudicial error. It explained the deputy's timely arrival and is equivalent to the testimony we frequently hear from officers that "in consequence of a telephone call from *X*" they went to a designated spot, where they found a certain item or person. Such evidence does not itself tend to link a defendant with the *corpus delicti*, but it does relate to other evidence so tending.

As previously pointed out, the State's evidence was sufficient, without the bloodhound evidence, to take the case against defendant to the jury. Upon a third trial, "with the dog left out," we apprehend that the verdict would be the same, because of defendant's possession of the bills. See *State v. McLeod*, 198 N.C. 649, 152 S.E. 895 (second trial) (dissent

of Brogden, J.). The bloodhound evidence could not have brought about the result. *State v. Norris*, 242 N.C. 47, 86 S.E. 2d 916. The burden is on defendant to show not only that there was error but also that the error affected the result adversely to him.

In the trial we find

No error.