STATE OF NORTH CAROLINA v. BOBBY GEORGE LANIER

No. 8022SC687

(Filed 20 January 1981)

**Burglary and Unlawful Breakings § 5.1; Criminal Law § 44— actions of bloodhound — testimony inadmissible — insufficiency of evidence**

In a prosecution of defendant for breaking or entering, evidence relating to the actions of a bloodhound should have been excluded because the State failed to show that the dog was put on the trail of the guilty party under such circumstances as to afford substantial assurance that the person trailed was in fact the person suspected, and the case should have been dismissed for insufficiency of evidence where the evidence tended to show that one and a half to two hours after a breaking occurred, one and a half to two miles away, defendant was found on a little sandbar by a creek; there was no evidence tending to establish that defendant was ever at the residence broken into; the only witness to the crime was unable to identify the man he had seen leaving the residence; there was no evidence defendant was at the place at which the dog was released to track the thieves; there was no evidence placing stolen guns or other stolen items in defendant's possession; there was evidence of footprints in the vicinity of the residence, but no evidence indicating they were defendant's footprints; and there was was no evidence that defendant attempted to flee to avoid capture.

APPEAL by defendant from *Rousseau, Judge.* Judgment entered 12 March 1980 in Superior Court, DAVIDSON County. Heard in the Court of Appeals 2 December 1980.

Defendant was charged in a proper bill of indictment with breaking and entering, larceny and receiving.

The State's evidence, in summary, was as follows:

George Bates, a neighbor whose house was "about one hundred feet" from that of Roy Hartman, the victim of the alleged offense, testified that on 30 September 1979 he saw a masked man run to Hartman's back door and go down a stairway. A few seconds later a smaller man did the same. It "was about 10:00 o'clock in the morning" when he first saw these two men. Bates heard glass break in the door. He then saw one of the two men "come out the back door with two guns," and he "asked him to hold it right there." The man then "hollered at the one inside the house and started running." The other man "ran out and ran around the house where [Bates] could not see him." The first man "had on a mask," and the second had what "looked like a stocking over his head." Bates "was not able to recognize the two men at [his] neighbor's house." He "could not tell any-

thing else about them such as race or anything of that nature." Bates testified:

> The closest I ever got to the two men I saw coming out of the house was about a hundred feet. I could not recognize who they were, nor could I see the color of their hair. One was a little heavier than the other; he had on the ski mask. The other one had a stocking over his head. Both were built kind of husky.

The final question to Bates on cross examination, and his answer, were:

Q. The fact of the matter is you can't say you saw Mr. Lanier (the defendant) come out of the house?

A. No, I couldn't see his face, that's what I recognize a man by is his face.

Roy Hartman, the owner of the home which was broken into, testified that he returned home from church on 30 September 1979 and found that his basement door and the wall between the stairsteps were torn down. His belongings were scattered about the house and certain items including a .22 rifle and a .12 gauge shotgun were missing. He did not know the defendant, Bobby George Lanier, and he had not given the defendant or anyone else permission to enter his home that morning and remove anything.

Paul Lanier, an employee of the North Carolina Department of Corrections, testified on direct examination that his duties with the Department included "running escapees when they escape from prison, bank robbers, anything like that with bloodhounds." He had performed these duties "for about twelve years." On the morning of 30 September 1979 at a time he could not recall he had brought a registered bloodhound with him to the Hartman residence. He had "worked with that particular dog three or four years."

Lanier then testified on *voir dire* that he had trained this dog himself; that she was "pure blood" and was "from the dog from Hee Haw, Boraguard (sic);" that he had worked with the dog's father and mother in tracking prisoners, and this dog had "caught prisoners before;" and that he was "not an expert at dog pedigrees."

He further testified on *voir dire* that when he arrived with the dog at the Hartman residence on 30 September 1979, "one of the deputies . . . said two fellows had run out of the back of the house." He had "put the dog around at the back of the house and run a track . . . east of the Hartman house where [he] lost the track." He then took the dog back to the house where he "started north away from the house, running another track for approximately a mile and a half or two miles." He "then went east and north; then west and [found] the defendant [who] was beside a creek that runs behind the Hartman's house out in the woods." The defendant "had on a pair of shoes and a pair of pants, but that's all he had on." Lanier testified: "The dog was following a track from the time I put him on that track until the time I found [the defendant]. It was around noon when I ran upon [the defendant]."

The trial court overruled defendant's objections to Lanier's testimony, and he then testified on direct examination that "[t]his bloodhound was bred for tracking human beings;" that it was "approximately four years old," and he had trained it "from a puppy;" and that it "had been used successfully to track human beings on more than one occasion prior to September 30, 1979." He then reiterated before the jury his *voir dire* testimony about having "put the dog on the track," having lost one track, and ultimately while pursuing a second track having found the defendant "on a little sandbar, where some water comes into the main creek." He testified that he "observed human footprints," but he did not at anytime link the footprints to the defendant. He also testified that the defendant "did not have anything with him at the time [he] found him."

On cross examination Lanier testified that when a dog he trains "gets on track," it is "supposed to" and "usually does" stay on the track of the "particular person or thing;" that when a prisoner escapes and "we put the dog in on that track, most of the time that is who we catch, the prisoner that run;" but that "sometimes we run across a hunter [and] that dog will run that track a little way," and that the dog "wouldn't stay on [the scent or track] everytime." He stated that on this occasion he "started tracking . . . somewhere after 10:00 o'clock . . . in the morning" and "caught [defendant] around dinner;" that he ran "a pretty good while before [he] caught anybody;" and that he "started sometime after 10:00 o'clock [and] it was about 12:00 when [he] caught him." He imagined he "was running that dog approximately an hour

and a half." When he first saw defendant, defendant "wasn't trying to get away from [him]."

Greg Kirkman, a detective with the Davidson County Sheriff's Department, testified that he arrived at the Hartman home at approximately 12:30 on 30 September 1979; that he went to the edge of the back yard and "started down a slight grade approximately one hundred feet;" that he found a barbed wire fence that was down; and that he found two weapons "on the far side of the fence from the house," "a .22 rifle and a .12 gauge shotgun." He "took the weapons back to the house where Mr. Hartman identified them" (presumably as the weapons Hartman had testified were missing from his house).

Defendant offered no evidence. The trial court denied defendant's motion to dismiss, and the jury returned a verdict of guilty of felonious breaking or entering and larceny.

From a judgment of imprisonment, defendant appeals.

*Attorney General Edmisten, by Assistant Attorney General George W. Lennon, for the State.*

*Leonard and Snyder, by James E. Snyder, Jr., for defendant appellant.*

WHICHARD, Judge.

Defendant contends the trial court erred in admitting the testimony of the State's witness as to the actions of the bloodhound and in refusing to grant his motion to dismiss for insufficiency of the evidence. We agree with both contentions.

In *State v. McLeod,* 196 N.C. 542, 545, 146 S.E. 409, 411 (1929), our Supreme Court, per Chief Justice Stacy, set forth the rule on admission of evidence regarding actions of bloodhounds as follows:

> It is fully recognized in this jurisdiction that the action of bloodhounds may be received in evidence when it is properly shown: (1) that they are of pure blood, and of a stock characterized by acuteness of scent and power of discrimination; (2) that they possess these qualities, and have been accustomed and trained to pursue the human track; (3) that they have been found by experience reliable in such pursuit; (4) and that in the particular case they were put on the

> trail of the guilty party, which was pursued and fol-
> lowed under such circumstances and in such way as
> to afford substantial assurance, or permit a reasona-
> ble inference, of identification.

This rule has been quoted with approval in recent opinions of the Supreme Court. *See State v. Irick,* 291 N.C. 480, 495-497, 231 S.E.2d 833, 843-844 (1977); *State v. Rowland,* 263 N.C. 353, 358-361, 139 S.E.2d 661, 665-666 (1965).

We do not consider whether the evidence here met the first three *McLeod* requirements, for we find that it clearly failed to meet the fourth requirement. For bloodhound evidence "[t]o be considered by the jury, it is necessary for the State to show that the dog was put on the trail of the guilty party under such circumstances as to afford substantial assurance that the person trailed was, in fact, the person suspected." *State v. Marze,* 22 N.C.App. 628, 630; 207 S.E.2d 359, 361 (1974). Nothing in this record tends to establish that the defendant was ever at the Hartman residence. The witness Bates testified that he saw two men at the residence, but he was unable to identify them. There was no evidence whatsoever that the defendant was at the place from which the dog was released to track the thieves. There was evidence that a .22 rifle and a .12 gauge shotgun were missing from the Hartman residence, and that they were found "on the far side of the fence from the house;" but there was no evidence whatsoever placing them or other stolen items in defendant's possession or placing defendant closer than "about a mile and a half or two miles" from where they were located. There was evidence of footprints being found in the vicinity of the Hartman residence, but no evidence what-soever indicating they were defendant's footprints. There was no evidence whatsoever that defendant was fleeing to avoid capture.

The evidence tending to "afford substantial assurance . . . of identification" in *McLeod* was considerably greater than that here; yet, the Supreme Court in *McLeod* held that it should have been excluded. *A fortiori,* the evidence here should have been excluded. Likewise, there was considerably more evidence in *Marze* than here tending to identify the defendant and to point to his guilt; yet, this Court considered that evidence insufficient to go to the jury. *A fortiori,* the evidence here was insufficient to go to the jury.

The sum of the evidence against this defendant is that one and one-half to two hours after a breaking occurred one and one-half to two

miles away, he was found on a "little sandbar" by a creek watching the rippling of the brook on a Sunday afternoon. If this constitutes criminal conduct, the author of this opinion pleads guilty to repeated offenses; and he only regrets the infrequency of their occurrence. Further, this may be the type of case Shakespeare had in mind when he wrote:

> The jury, passing on the
> prisoner's life,
> May in the sworn twelve
> have a thief or two
> Guiltier than him they try.[1]

The evidence relating to the actions of the bloodhound should have been excluded for its failure "to afford substantial assurance or permit a reasonable inference, of identification" as required by *McLeod*. 196 N.C. at 545, 146 S.E. at 411. Without this testimony, the record is devoid of any evidence which even raises "a suspicion or conjecture" as to defendant's guilt, and certainly does not contain the "substantial evidence of all material elements of the offense [necessary] to withstand the motion to dismiss." *State v. Stephens,* 244 N.C. 380, 383, 93 S.E.2d 431, 433 (1956). *See also State v. Smith,* 40 N.C. App. 72, 252 S.E.2d 535 (1979).

The judgment is therefore vacated and the cause remanded to the superior court for entry of judgment of dismissal.

Vacated and remanded.

Judges HEDRICK and CLARK concur.

---

[1] W. Shakespeare, *Measure for Measure*, Act II, Scene 1, line 19.