# AUGUSTA CROSBY v. MICHAEL MORIARTY AND OTHERS.[1]

## February 4, 1921.

## No. 22,063.

**Arson — verdict sustained by evidence.**
1. The evidence amply sustains the verdict that defendants did not set or cause to be set the fire which destroyed plaintiff's barn.

**Evidence inadmissible because no foundation was laid.**
2. Even were testimony as to trailing of criminals by bloodhounds held admissible, a question not decided, there was no foundation laid for its reception in this case, nor was the testimony excluded of any probative value whatever.

**Rules of evidence not affected by bloodhound statute.**
3. The statute under which county commissioners may authorize the sheriff of a county to purchase a pair of bloodhounds to be kept for use in pursuing and apprehending criminals and fugitives, does not affect the rules of evidence.

[1] Reported in 181 N. W. 199.

Action in the district court for Le Sueur county to recover $1,525 for setting plaintiff's buildings on fire. The answer was a general denial. The case was tried before Tifft, J., and a jury which returned a verdict in favor of defendants. From an order denying her motion for a new trial, plaintiff appealed. Affirmed.

*C. J. Laurisch* and *F. C. & H. A. Irwin,* for appellant.

*W. H. Leeman,* for respondents.

HOLT, J.

Action to recover damages for wilful destruction of property. Defendants prevailed and plaintiff appeals from the order denying a new trial.

Shortly after 9 o'clock on Sunday evening, September 14, 1913, plaintiff's barn was discovered on fire, and was consumed together with six horses, a quantity of hay and farm implements. The indications were that the fire was set. · Gossip mistrusted defendants. They were indicted, tried and acquitted. Thereafter, one of them, Moriarty, brought an action for malicious prosecution against this plaintiff, her brother, William Almich, and her son. It failed. Moriarty v. Almich, 141 Minn. 247, 169 N. W. 798, 3 L.R.A. 161. Then this action was instituted.

The barn and dwelling of plaintiff were located easterly of and close to the main traveled road between Le Sueur and Belle Plaine about two miles east of Henderson. Defendants were neighboring farmers of middle age, owning farms to the north and west of plaintiff. Moriarty had a straw pile on the west side of the road some 30 rods north of plaintiff's barn. The morning after the fire, tracks were discovered near this straw stack and also in a cornfield on the east side of the road, about 20 rods north of the barn. Some of the tracks appeared to be made by a 7 size shoe and some by a 10 size. One or two witnesses, going to the fire in an automobile, testified to seeing two men standing by the straw stack, one of whom called out to the witness that the fire was too hot to pass it with the car. The witness took the man to be defendant Kahlow. The other man was smaller. Six other witnesses, going to the fire in a car, testify to seeing two men by the side of the road about 70 rods south of Moriarty's home, near the road leading to the home of one Julius Malz, not Louis Malz the defendant. And some of the men iden-

tify Moriarty and Kahlow as the persons. Moriarty admits that he was there, but says that the other person with him was Ruth, his daughter, then 13 years old. Kahlow wears a 10 size shoe, and Moriarty a 7 or 7½. There is also some evidence that Moriarty bore a grudge towards plaintiff's son, because the latter and not Moriarty had succeeded in obtaining a lease of Nellie Moriarty's farm. A school dispute had caused enmity between plaintiff's brother and defendant Kahlow, and the former seems to have suspected the latter of having caused the fire and was active in the criminal prosecution.

The divorced wife of defendant Malz also testified that, on the Sunday previous to the fire, Moriarty and Kahlow came to the field where she, her then husband, and her sister were cutting corn, and that Kahlow then proposed to her husband that he go with them the following Sunday and burn Almich's barn, but Moriarty spoke up and said they should take plaintiff's barn first. When plaintiff rested, the case was dismissed as to Malz. Of this there is no complaint.

It is undisputed that on Sunday afternoon Kahlow went with Moriarty to a barn on a farm of the latter, a short distance south and west of his home farm, to attend to some stock. That later in the day, Kahlow drove to Henderson for a cornbinder he had bought. He testified that at about 6 o'clock he started home, three miles distant, with the binder; that he reached home about 7 o'clock, did his chores, ate supper, and then went to bed where he remained all night; and that he did not know of the fire until the next morning when told by Moriarty, who came over to help him set up the binder. He is corroborated by his wife and two daughters that he was at home from 7 o'clock until morning. Of course he denied that he was near plaintiff's barn, or near the straw pile mentioned, or in the road at the time of the fire. Moriarty testified that he was home during the whole evening; that he did the chores, ate supper and lay down on the bed to rest, without undressing; that while he was thus resting his daughter Ruth came in and told him their straw pile was burning; that he went out to investigate and ascertained that it was not the straw pile, but some of plaintiff's buildings; that he and Ruth went out on the road, walked some 70 rods towards the fire, and were standing there looking at it when the car carrying the six men passed; that he and Ruth then returned to the home. He denies that

he was down by the straw stack or in the cornfield near plaintiff's barn, or near the barn that evening. He is fully corroborated by his daughter and his wife. Both defendants deny the story of Malz's divorced wife and assert that they did not go to Malz's field at all. They are corroborated by Malz's present wife, the sister of the former wife, and by Malz. There is other evidence supporting defendants and there are circumstances, not necessary here to state, discrediting the, in itself, incredible story of defendant Malz's divorced wife.

The sufficiency of the evidence to sustain the verdict is challenged by the appeal. But, from the mere outline of the defense as above given, it is plain that there is no lack of evidence to support a verdict for defendants, even had plaintiff's case been strong, which it was not.

The only other assignment of error relates to the exclusion of testimony describing the conduct of a certain dog when set on the tracks which were noticed near the straw pile and in the cornfield the morning after the fire. It appears that, nine months before the fire, the sheriff of Blue Earth county had been authorized to purchase "a pair of bloodhounds for use in pursuing and apprehending criminals and fugitives." (Section 5, chapter 156, Laws 1917). He procured them in Omaha. The deputy sheriff, Mr. Ario, was the keeper of the dogs. He was sent for and arrived at the fire 18 hours after it started. He set the female dog on the tracks at the straw pile, also on those in the cornfield. Mr. Ario was sworn and attempted to lay a foundation for the introduction of testimony of the conduct of the dog in trailing the tracks. It was then agreed that, should the court conclude to receive such testimony, that taken on the trial in Almich v. Moriarty should be read to the jury, and Mr. Ario was excused.

Several courts in the southern states have held such evidence admissible. The supreme court of Nebraska refuses to consider it. Brott v. State, 70 Neb. 397, 97 N. W. 593, 63 L.R.A. 789. Justice Weaver of Iowa treated the subject in a humorous vein in McClurg v. Brenton, 123 Iowa, 368, 98 N. W. 881, 65 L.R.A. 519, 101 Am. St. 323, but found it unnecessary to determine whether such evidence was admissible. We do not intend to pass on the question now for two reasons: (1) The foundation laid was insufficient even under the authorities most firmly committed to the rule of its admissibility; and (2) the conduct of the

dog here in question was so void of any tangible indications as to be utterly valueless.

The rule as to the necessary foundation, required by the courts admitting this sort of testimony, is well stated in State v. Dickerson, 77 Oh. St. 34, 82 N. E. 969, 122 Am. St. 479, 11 Ann. Cas. 1181, viz.:

"It is apparent that before the acts and the conduct of the dog can be shown, a proper preliminary foundation must be laid, and to establish such foundation it must be shown that the particular dog used was trained and tested in tracking human beings, and by experience had been found reliable in such cases; that the dog so trained was laid on the trail, whether it was visible or invisible, at a point where the circumstances tended clearly to show that the guilty party had been, or upon a track which the circumstances indicated to have been made by him. In addition to this the reliability of the dog must be proved by a person or persons having personal knowledge thereof. This foundation may be strengthened by proof of pedigree, purity of blood, or the exalted standing of his breed in the performance of such peculiar work."

To the same effect as to foundation see: Hargrove v. State, 147 Ala. 97, 41 South. 972, 119 Am. St. 60, 10 Ann. Cas. 1126; Davis v. State, 46 Fla. 137, 35 South. 76; State v. Adams, 85 Kan. 435, 116 Pac. 608, 35 L.R.A.(N.S.) 870; Aiken v. State, 16 Ga. App. 848, 86 S. E. 1076; Pedigo v. Commonwealth, 103 Ky. 41, 44 S. W. 143, 42 L.R.A. 432, 82 Am. St. 566; Spears v. State, 92 Miss. 613, 46 South. 166, 16 L.R.A. (N.S.) 285; State v. Norman, 153 N. C. 591, 68 S. E. 917; Baum v. State, 27 Oh. C. C. R. 569; and Parker v. State, 46 Tex. Cr. App. 461, 80 S. W. 1008, 108 Am. St. 1021, 3 Ann. Cas. 893.

Ario knew nothing as to the training or pedigree of the dogs except by hearsay. He was not present when they were bought in Omaha. He had had them out a few times to trace criminals and lost children. To what extent they therein showed themselves efficient is not disclosed. We think Ario was not in position to qualify the dogs. But, what is more in point, there is no evidence tending to connect the tracks on which the dog was set with the person who set the fire. No track on which the dog was set came within 15 rods of the barn. Nor is there anything to indicate that the tracks both at the straw pile and in the cornfield were not made by some of the many persons that flocked to the

fire, after the alarm was given. The foundation was insufficient to admit any testimony of the conduct of the dogs. And, when that testimony is examined, it proves either that the dogs were worthless or else the conditions were such that no clue to the incendiary could be obtained from the suspected tracks.

Ario testified: "I placed the dog on four different tracks, the first one started at the straw pile, the dog followed that north on the road and stopped about three quarters of the mile from the fire. I then put it on the track in the cornfield on the east side, just beyond the barn the dog made a circle, went out into the road a little ways and stopped. My attention was then called to the lady's tracks in the corn on the east side of the road * * * the dog then went north, to the first house on the right hand side, went through the yard to the next house, I do not know who lives there." Neither defendant lives in these houses. And then as to the last test, he testified: "The fourth track I placed the dog on was right at the fence about half a mile from where the fire was, that track led to the first house on the left hand side." This last house probably refers to Moriarty's. The above is the substance of his testimony. It is clear to us that it tends to establish no circumstance worthy to be taken in consideration in determining whether either defendant set the fire. We think the learned trial court ruled correctly when all testimony in respect to the conduct of the dog when set on the tracks mentioned was excluded.

The statute above referred to in respect to the purchase of bloodhounds by the county for certain uses can have no bearing on the rules of evidence.

There is no error in the record and the order must be affirmed.