## ROLEN *v.* STATE.

### Crim. 3972

Opinion delivered January 13, 1936.

*W. F. Reeves,* for appellant.

*Carl E. Bailey,* Attorney General, *Guy E. Williams* and *J. F. Koone,* Assistants, for appellee.

BAKER, J. The appellant, Sump Rolen, alias Sumpter Rowland, was indicted by the grand jury of Van Buren County upon a charge of assault with intent to kill and murder one Jake Johnson. Upon trial he was convicted

and sentenced for a term of one year in the State penitentiary. To reverse the judgment of conviction, he has appealed.

The errors alleged upon appeal are that the court erred (1) in permitting Jake Johnson to testify in regard to bloodhounds trailing the defendant; (2) that the court erred in a refusal to strike the evidence of the said witness, and in a refusal to direct the jury not to consider the same; and (3) that the court erred in permitting J. W. Hatchett, the sheriff, to testify as to the action of the bloodhounds in trailing the appellant, and (4) in the refusal to take from the jury this evidence.

Otherwise stated, the only question for consideration upon this appeal is evidence in relation to the use of bloodhounds and in permitting the jury to hear the evidence of two witnesses who were with or followed the bloodhounds the next morning, when officers were making an effort to trail or follow the assailant of Jake Johnson, who had been shot the midnight before.

No other question has been brought up for our consideration. Therefore, unless we determine that there was error in permitting the two witnesses to testify before the jury in relation to the action of the bloodhounds, the case must be affirmed.

A concise statement of the questioned matters as they appear in the record is about as follows:

Jake Johnson, a man about 70 years of age, testified that he had known the appellant about seventeen or eighteen years, and that on or about the 22d of June, 1933, he was awakened during the night, and at the time a light fell on his face, and that he asked what was wanted, and some one said, "Just lie still." He thought he recognized the voice, but was not positive. He told some one then to go around the house, and at the same time reached for the door knob to shut the door. Again he asked, "What do you want?" and some one on the outside said, "Just raise up a little bit." When he reached up to get his gun, he jumped to one side, and just as he jumped a person on the outside fired a shot through the door and struck him in his right arm. He says he recognized the voice and

the person on the outside who spoke the second time; that it was the voice of Sump Rolen, appellant here.

The night was hot, the doors were open, but the screens were closed and fastened on the inside, and the witness was about fifteen or sixteen feet from the screen door. This occurred about 12:30. He "heard the parties run out the gate, first to the north and then to the east." He then got in a car and went to Clinton, where his wounds were dressed, and he asked Mr. J. W. Hatchett to get the bloodhounds to track down his assailant. Mr. Hatchett was the sheriff. He told him he wanted the best bloodhounds he could get, to make arrangements to get them, and the witness would pay whatever it would cost. A fellow came with two hounds and the dogs were started from the porch. They took their trail from that point. At this point in the examination the court sustained an objection to the testimony as to the conduct or activities of the dogs without a showing of the qualifications of the hounds to pick up trails and follow them, and then Mr. Johnson, the witness, was asked if he had had experience with bloodhounds prior to that time. In response he said that he was not an experienced trainer of bloodhounds, but that he had been with them, observed them in their work, and had seen them trained for a period of about two years; that from his experience and observation he could tell whether the hounds were trained or not and capable of following a trail. The hounds that were brought there were used by the police force of the State, or officers at the State penitentiary. Upon appellant's cross-examination of this witness, he went into somewhat minute or detailed argument with his cross-examiner to the effect that bloodhounds were not used if they were not trained; that, if they cannot trail a scent, they are not kept; that that is the purpose for which they are kept. He did not know the parties who brought the bloodhounds, but he knew the dogs were bloodhounds when he saw them. He knew that they had been trained when he saw them working; that he could tell whether the hounds had been trained by seeing them at work. He had never seen these dogs before, but he stated that a man who had been with

dogs like these could tell about their training by observation of their work. He had not seen them working any other time. He only knew they were trained from observation. He went on to say that when he saw the dogs stick their noses to the door and get the scent off the door knob he well knew that the dogs were trained, and he knew it also when the dogs yelped and got the scent and got the trail. He didn't try them out on any one else as that was unnecessary. He went on to tell that Mr. Hatchett followed the dogs. He never saw them trail any one else.

With this qualification the court permitted the witness to testify that the dogs struck a trail at the door and went off up the hill; that they took the trail at the door knob and from the floor on the porch and went about 75 or 100 yards, turned and came back; that again they started, took hold of the track and went on as before. The dogs followed the same general direction that the witness had heard the man take when running away the night before. This was about all the testimony from this witness.

The sheriff, Mr. J. W. Hatchett, was called and stated that he made an investigation of the shooting of Jake Johnson; that he was asked to secure bloodhounds proved and trained ones, and he thought he knew where they had the best ones, and, from what he knew about them, he thought they were trained. He talked with some one at the State penitentiary at Tucker.

He had seen the bloodhounds at the penitentiary that were kept there for the purpose of trailing escaped prisoners. They had been shown him by the manager of the bloodhounds, and the keeper had also shown them to him. He testified that he did not know anything about the training of the dogs. He had gone, however, prior to that time, with bloodhounds trailing criminals. He had seen these particular hounds at the penitentiary, and it had been explained to him that they were the ones used when prisoners escaped. He knew the older one of the two hounds was one he had seen at the penitentiary. He went on to explain that he followed the hounds and their

keeper. They went down through the woods and trailed to Sump Rolen's backyard and to the back door of Sump Rolen's house. They then trailed from the front of the house and followed the trail to Elba. They went down in town but were then "pulled off the track." He went and arrested Rolen, who denied his guilt, but admitted that he had gone down where the dogs had gone from his house toward Elba where he had gotten on a handcar and had ridden some distance to the place where he had gone to work. The sheriff measured tracks he saw along the trail the dogs followed going toward Sump Rolen's house and measured other tracks going from Rolen's house and compared them and they were the same. He stated further that Rolen denied he had been along the trail or path the dogs had followed in going to Sump Rolen's house.

This was all the evidence relative to the activities of the dogs and substantially all the statements made relative to the training of the dogs, or the handling of them as they trailed the supposed assailant of Johnson.

The foregoing will be taken also as the full effect of the testimony in so far as it relates to the proposition here under consideration.

The evidence disclosed, however, that other people lived at the same place occupied by Sump Rolen, at least two or three others, and in addition there was a total lack, so far as it has been abstracted for our consideration, of motive actuating Rolen in the commission of the crime of which he is accused. Moreover, there was further proof that Rolen was at his home that night, that he went to bed rather early on account of the fact he had been at work that day and was somewhat tired and that others there were up with a sick child. They testified that Rolen did not leave the house at that time.

We cannot know or surmise just what value the jury may have placed on the conduct or activities of the bloodhounds, if indeed they found the testimony to be worth anything. We do not think, however, under the showing made, that it was improper or prejudicial for the court to submit to the jury this evidence under proper instructions. The witness, Johnson, testified as above stated, to sufficient facts as to his qualifications and ability to judge

bloodhounds for the jury to determine from his statements that these hounds were trained. There is no proof about how the hounds were handled except proof that they were taken to a place where the man had been who fired the shot; that they followed the same general direction that was taken by the man who ran away after the shot was fired. So far as the evidence discloses, those who were handling the dogs merely followed them until they went to the home of Rolen and after they left that place to Elba.

There is further evidence, however, given by Mr. Hatchett, who had seen these dogs at the penitentiary on different occasions. They had been shown to him. He knew something of their reputation as trailers, of their ability to follow escaping criminals. It may not be amiss to suggest that with this explanation on his part that these dogs were kept by said officers, wardens and those in charge of the penitentiary for the purpose of recapturing those who escaped, that there is necessarily a presumption that they were suitable for that purpose.

It is strongly urged that since Mr. Johnson had not worked with bloodhounds in perhaps forty years, or more, that his testimony should not have been accepted as tending to lay a proper foundation for introduction of the testimony as to activities of these dogs in trailing the supposed criminals. These matters were all submitted to the jury, and the jurors with their common sense, knowledge and information, doubtless realized, as everyone must agree, that some men have the power of keen observation, retentive memories, the power to assimilate facts and understand them and make use thereof throughout a lifetime. On the other hand, if Mr. Johnson's testimony, or that of Mr. Hatchett, was of little or no value, the jurors, and not the members of this court, necessarily determined and fixed the value of this testimony. It is not shown that the case was tried at variance with or different from the principles announced in the case of *Holub* v. *State,* 116 Ark. 227, 172 S. W. 878, or the case of *McDonald* v. *State,* 145 Ark. 581, 224 S. W. 976. It is a stronger case than that of *Fox* v. *State,* 156 Ark. 428, 246 S. W. 862. The Fox case was affirmed.

1126

In the Fox case Titus Measles did not even know that his dog was a bloodhound, one of the kind that is presumed to be of the breed used to trail human beings. Measles did not pretend to be a trainer of dogs and no one really testified that his eleven months' old hound pup had received any particular training or that he had any reputation as being reliable as a trailer. He was not even kept at a time or place for use in trailing escaped prisoners or other persons.

It was not error to submit the foregoing facts under proper instructions to the jury. Under such conditions the jury's province to determine the effect and value thereof was exclusive. We must and do presume a proper submission.

It is unnecessary that we discuss other testimony, or even set it forth. We have considered all the facts as abstracted and presented, and think there is sufficient testimony to warrant the verdict of the jury, and that there was no error in permitting the testimony as to the activities of the bloodhounds upon the showing of qualifications offered in testimony prior to the introduction of this questioned proof.

The judgment of the court is therefore affirmed.