HINTON *v.* STATE.

(Division A. Mar. 30, 1936.)

[166 So. 762. No. 32109.]

Shannon & Schauber, of Laurel, for appellant.

**W. D. Conn, Jr.**, Assistant Attorney-General, for the state.

**McGowen, J.**, delivered the opinion of the court.

On an indictment charging him with larceny, Joe Hin-

ton was tried, convicted, and sentenced by the court to serve a term of three years in the state penitentiary.

Robert Hinton, the owner of the money stolen, testified that on the third Sunday in April, 1935, he left three hundred eighty-five dollars in money with his wife, Willie Hinton, and went away to his work, which was some distance from his home, and that at noon of the following day, he was notified that his money had been stolen.

His wife, Willie Hinton, testified that on the night of the third Sunday in April, 1935, after she had retired, Joe Hinton, the appellant, came into her room and asked her ''to come to bed with him and I told him that he had made agreement with me to never mention a question like that to me no more, and I commanded him to leave the room and as he started to leave—I had the money wrapped in the corner of a flour sack, and as he started to leave he run his hand under the pillow and grabbed it out and run through the dining room and jumped out of the window and left.'' She arose, dressed, and went to a neighbor's house, that of R. C. Moore, and reported the theft, from there to Col. Hinton's house and also reported the theft; and by noon of the next day she reached her husband and told him of the theft. On her way back to her home she notified the officers, and they procured bloodhounds and brought them to her home.

R. C. Moore and Col. Hinton testified that they lived a short distance from Robert Hinton; that his wife reported the theft to them about ten or eleven o'clock on the night it happened. The accused lived about a mile and a half or two miles from the place where the larceny occurred. A boy, fourteen years old, the son of R. C. Moore, was sleeping in the bed with Willie Hinton on the night of the theft. She dressed before she awakened him and told him of the theft, and she made

no outcry or effort to pursue the accused. She said she saw the appellant, the accused, by the light of a pine-knot fire burning in her room, and positively identified him; but no explanation was made of his knowledge of the place where the money was kept—under the pillow, in a flour sack, on the bed where she slept.

M. S. Jenkins testified that he was the owner and trainer of bloodhounds; that he put two such hounds on the trail of the thief twenty-four hours after the theft was said to have occurred; that at the window of the dining room, through which the thief escaped, a foot track was found; that the dogs scented it and began to trail; that they leaped up against the house toward the window, thence proceeded to the home of the accused, and leaped upon a bed therein which had been slept on. The dogs were then picked up and driven to the county courthouse, where the appellant was, having already been arrested, and they were put down again; that they immediately picked up appellant's trail and followed it to the jail and into the cell occupied by the appellant and another, and leaped into the bunk against the appellant and bayed.

Jenkins testified that the two bloodhounds used by him on this trail were full-blooded English bloodhounds and registered by the American Kennel Club; that he had such registration papers; that one of the dogs he had owned for seven years and the other for not so long. He did not produce in court the registration papers of the dogs nor did he know the sire or dam of the dogs. He testified that he had been an expert trainer of bloodhounds to follow the trail of human beings for fifteen years; that the dogs were reliable and true on the trail, and that they had been permitted to trail no other animal; that once they started on a trail they would not leave it; and that he had tested them by running a thousand or more human beings, and that they had not

failed in such trails. He stated that where a human being gets upon a train or into a car the dogs have failed to follow the trail. He further stated that these dogs were purchased from the Rookwood Kennel, a kennel recognized throughout the world for its bloodhounds. He also stated that a trail was harder for the dogs to follow in a "dry spell" than in a "wet," and that on this occasion it was "wet." There was some other evidence, but of no importance.

■ We are asked to reverse this case because the court below refused to grant appellant a continuance. No sworn application for a continuance was presented to the court. The motion was dictated into the record, which was overruled by the court, but no attempt was made to comply with the statute governing continuances. Section 576, Code 1930. Continued diligence was not shown, nor were the absent witnesses or their affidavits presented on motion for a new trial. If there had been a proper formal application for the continuance of the case, it was necessary to follow it up by having the witnesses appear in court, or their affidavits, or a showing as to why the affidavits could not be had, as is required in Lamar v. State, 63 Miss. 265. This rule has been followed many times by this court. Blevins v. State, 169 Miss. 868, 154 So. 269; McKnight v. State, 171 Miss. 152, 157 So. 351.

■ We are asked to reverse the case because the testimony of the chief state witness, Willie Hinton, is so unreasonable and unreliable that a verdict ought not be allowed to stand thereon. The inconsistencies in her testimony, if such there were, are wholly arguments for the jury, and she stands unimpeached in the record. We cannot disturb the verdict where a witness is unimpeached because the witness' conduct was different from what another might have done under the same circumstances. The jury are the sole judges of the weight and credibility of the evidence, and, under our system,

are the exclusive triers of fact. The testimony in this case is not improper, is not contradicted, is not so highly improbable that the truth of it becomes so extremely doubtful as to be repulsive to the reasoning of the ordinary normal mind.

■ It is insisted that the testimony as to the bloodhounds was incompetent, for the reason that the dogs were not shown to have been purebred, tested, and to have been found reliable. In Harris v. State, 143 Miss. 102, 108 So. 446, this court said with reference to testimony as to bloodhounds: "Consequently, such evidence is admissible only after preliminary proof that the bloodhound which tracked to the accused is purebred, has been well trained to track human beings, has been well tested by tracking other men and found reliable, and that the track from which the bloodhound tracked to the accused was made by the person who committed the crime." In that case the court held that the evidence failed to meet the test, because the evidence failed to show that the bloodhounds were purebred and had been "tested by tracking other men and found reliable, and that the track from which the bloodhound tracked to the accused was made by the person who committed the crime." In the Harris case, supra, the owner testified that the dogs were subject to registration; here, the owner testified that he has registration papers from a bloodhound kennel recognized throughout the world. It was not necessary to offer registration papers. See Fisher v. State, 150 Miss. 206, 116 So. 746.

The evidence in the case at bar fully complies with the second test as laid down by the language of this court in the Harris case, supra: "One, and probably the only sure, test of the reliability of a bloodhound in tracking human beings is to put it repeatedly in a track known to have been made by a particular person, and see if it will track therefrom to that person. These tests should be so made as to demonstrate that the dog will

continue to follow the same track and not leave it for another." We think the case here meets the test that is laid down in the cases of Harris v. State, and Fisher v. State, supra, and Spears v. State, 92 Miss. 613, 46 So. 166, 16 L. R. A. (N. S.) 285.

It is next insisted that we should take judicial knowledge of the asserted fact that there was no member of the negro race on the grand jury which indicted the accused or on the petit jury which tried and convicted him. This record is absolutely barren of any reference to this matter. There is no record as to whether or not the members of this jury were of the white or colored race. We therefore decline to consider any question which is wholly aliunde—not presented to the lower court—and not supported by evidence indicating unfairness with reference to the grand or petit juries, or that the accused was not tried by a fair and impartial jury. We find no reversible error in this record.

Affirmed.