# State of Vermont v. Patrick Bourassa

[399 A.2d 507]

No. 23-78

Present: **Barney, C.J., Daley, Larrow, Billings and Hill, JJ.**

Opinion Filed February 6, 1979

*Mark J. Keller*, Chittenden County State's Attorney, and *Susan R. Via*, Deputy State's Attorney (On the Brief), Burlington, for Plaintiff.

*James L. Morse*, Defender General, *William A. Nelson*, Appellate Defender, and *Steve Dunham*, Law Clerk (On the Brief), Montpelier, for Defendant.

**Daley, J.** The defendant appeals from a jury verdict and subsequent judgment of the district court finding him guilty of the crime of breaking and entering in the nighttime in violation of 13 V.S.A. § 1201.

The record reveals the following facts:

Near midnight on July 10, 1977, a woman who lived some 150 to 200 feet away from Tom's Pharmacy in Colchester, Vermont, spotted two men on the roof of the pharmacy and called the police. From where she stood, she was able to continue to observe

the scene as she talked to the police. As the woman watched, the men cut a hole through the roof.

Eventually, one of the men, whom she described as blonde-haired and wearing a light-colored T-shirt, slipped down through the roof and into the store. Shortly thereafter the store's burglar alarm sounded. His companion, a dark-haired man clothed in what the witness described as dark clothing, leaped off the northeast corner of the roof and bolted into the darkness. Twenty seconds later, the blonde-haired man reappeared on the roof and also jumped off the roof and raced away. The time was approximately 1:20 a.m.

A police officer, who had been dispatched to the scene and who had concealed himself in tall grass approximately twenty-five yards from the southeast corner of the pharmacy, also heard the burglar alarm. He saw the men jump from the roof and scurry for the woods northeast of the pharmacy. He was unable to get a good look at the first man, but with the assistance of a powerful, six-celled flashlight, he saw the second man, whom he described as blonde-haired and wearing a light-colored shirt. That man was later identified as Raymond Bureau.

At 1:45 a.m., the officer heard someone walking along a drainage ditch that runs through the center of the wooded area. From the sound of the footsteps, the officer thought that the person walked along the ditch and then headed toward a few residences at the edge of the woods. As he peered toward the houses, the policeman saw a bearded man, who was wearing dark clothing, sidling between the residences. The officer radioed for assistance. Although two additional policemen joined the pursuit, they were unable to apprehend him.

Between 2:30 and 3:00 a.m., James Winter, an experienced dog handler, prepared his bloodhound, West Virginia Red, to track the culprits. He placed her in a harness, dropped her nose down over a patch of grass by the northeast corner of the pharmacy, where witnesses said the men had landed, and hollered a signal to the dog to follow the scent.

West Virginia Red circled in back of the pharmacy, went through a fallen section of fence into the fields and through the fields into an orchard. She made a left hand turn behind some houses and then followed the trail to a drainage ditch. She began to cross the ditch, but hesitated and reversed her steps, pacing along the edge several times before finally returning to the origi-

nal spot and crossing there. The trail led between two houses to the Macrae Road, which she crossed and followed for a short distance. Suddenly, she became very excited and jumped into the middle of the road, turning her face to the bushes at its perimeter. Winter followed her through the bushes into tall grass. He scanned the area with a small flashlight, but his cursory inspection revealed only what he took to be glimmers of scrap metal.

Thinking that West Virginia Red was mistaken, Winter tried to drag her back onto the course which she had originally pursued. But the dog was not to be deterred. She continued to pull him directly into the tall grass, so he again searched the area. This second sally disclosed a man lying face down in the grass. He was dark-haired, bearded, and clothed in denim pants and a blue work-shirt.

Police officers handcuffed the suspect and, as he was standing between them, West Virginia Red went up to him and placed her paws on his chest, indicating that she had found the person for whom she was searching. The man was Patrick Bourassa, the defendant in the case at bar.

Bourassa's hiding place was seventy-five feet from the car of Raymond Bureau, who was identified as the blonde-haired man on the rooftop at Tom's Pharmacy. He denied that he had been near the pharmacy or that he knew anything about the breaking and entering. He admitted that he had spent the early part of the evening with Bureau, but claimed that they had separated after the car developed mechanical troubles. Later, however, the car operated without difficulty. He explained his attempted concealment with the rationale that he had stayed behind with the auto, while Bureau went off in search of a mechanic, until, he said, the presence of so many police cruisers in the area frightened him and he abandoned the vehicle for the bushes.

After a trial by jury, in which the defense presented no witnesses, Bourassa was found guilty of breaking and entering in the nighttime, in violation of 13 V.S.A. § 1201. He now appeals, on four grounds: first, he challenges the admissibility of tracking dog testimony to prove the identification of a criminal defendant; second, he urges that even if such evidence is admissible, a proper foundation was not laid; third, he argues that the circumstantial evidence upon which he was convicted does not exclude all reasonable hypotheses but that of guilt; finally, he makes a claim of prejudicial hearsay which, being totally without merit, we do not recount here.

The question of the admissibility of tracking dog evidence is one of first impression in this state. However, the question has been widely considered elsewhere. Of the twenty-nine jurisdictions to whom the issue has been submitted, all but five have permitted such evidence upon a proper showing that the dogs were qualified to trail human beings and that the circumstances surrounding the trailing made it probable that the person tracked was the guilty party. Moreover, no court has rejected it since 1951. See generally, Annot., 18 A.L.R.3d 1221 (1968); 1 Wigmore on Evidence § 177, at 634 (3d ed. 1940); 3 Wharton's Criminal Evidence § 633, at 258 (13th ed. 1973).

Notwithstanding the weight of authority, the appellant urges that this Court should adopt the minority position and deny the admissibility of such evidence. He restates the minority's concern that the evidence is not always accurate nor infallibly reliable. Although we agree that tracking testimony may, on occasion, be unreliable, we cannot agree that it should be excluded in all instances. The requirement that a proper foundation be laid serves to exclude trailing testimony where the tracking is so uncertain and confused that it has no tendency to prove the defendant's guilt. Indeed, a careful reading of the minority opinions discloses that under the circumstances in which such evidence was rejected courts following the majority position would have excluded it as well. See *Terrell* v. *State*, 3 Md. App. 340, 346, 239 A.2d 128, 131 (1968).

Complaining that the scientific principles underlying tracking dog testimony have not been established in the record, the defendant argues that this Court should require generalized proof that dogs are capable of tracking human beings accurately before we hold the evidence admissible. We find no merit in his objection. There is sufficient evidence in the record to find that a well-trained dog, supervised by an experienced handler and working under reasonable conditions, is capable of trailing a human being accurately.

Although we hereby hold that tracking dog evidence may be relevant to prove the identity of a criminal defendant, it is admissible in particular cases only upon a showing of reliability in that instance. In order to establish the reliability of the evidence, a proper foundation must be laid. It must be shown, as a condition precedent to the admissibility of tracking dog evidence that: (1) the handler was qualified to use the dog; (2) the dog was

trained and accurate in tracking humans; (3) the dog was placed on the trail where circumstances indicate that the accused had been; and (4) the trail had not become so stale or contaminated that it was beyond the dog's tracking capabilities. *People* v. *Harper*, 43 Mich. App. 500, 508, 204 N.W.2d 263, 268 (1973). See also *People* v. *Centolella*, 61 Misc. 2d 726, 727–29, 305 N.Y.S.2d 460, 462–63 (Oneida County Ct. 1969).

As with all expert testimony, the sufficiency of the foundation is a preliminary question for the discretion of the trial court. It is reviewable only for abuse. Its decision is to stand unless it is made to appear from the evidence that it was clearly erroneous or founded on an error of law. *Currier* v. *Letourneau*, 135 Vt. 196, 203, 373 A.2d 521, 526 (1977); *Green Mountain Marble Co.* v. *State Highway Board*, 130 Vt. 455, 468, 296 A.2d 198, 206 (1972).

The defendant asserts that the foundation was inadequate and that the trial court abused its discretion in admitting the bloodhound evidence. He does not quarrel with the credentials of either James Winter or West Virginia Red: At trial the parties stipulated that Winter was an expert in the handling of bloodhounds and that West Virginia Red was trained and experienced in tracking human scent. However, he contends that the foundation was insufficient because, he argues, the State failed to prove the dog's pedigree and the dog was not properly placed on the scent.

A pedigree must be shown in many jurisdictions, but the most recent cases have not stressed pedigree as a prerequisite for the admission of trailing evidence, reasoning in essence that a dog's reliability lies in performance, not papers. See, e.g., *People* v. *Harper, supra*, 43 Mich. App. at 508, 204 N.W.2d at 268; *Terrell* v. *State, supra*, 3 Md. App. at 353, 239 A.2d at 135. In any event, Winter testified without objection that West Virginia Red was a purebred bloodhound. Since no attempt was made to impugn her lineage at trial, the point will not be considered for the first time on appeal. *State* v. *Doria*, 135 Vt. 341, 343, 376 A.2d 751, 753 (1977); *LaFountain* v. *Vermont Employment Security Board*, 133 Vt. 42, 48, 330 A.2d 468, 472 (1974).

Nor do we find any basis in the appellant's distinction that the dog should have been placed on the culprit's scent with an object that the men had abandoned on the roof rather than with the patch of grass where they landed after they leaped from the

roof. The grass was a sufficient starting point to link the accused with the scene of the crime.

■ The trial court properly exercised its discretion in admitting the bloodhound evidence. The testimony was of sufficient probative value to permit its being submitted to the jury for its consideration as one of the circumstances tending to connect the defendant with the crime. By returning a verdict of guilty, the jury resolved the issue in favor of the State. *State* v. *Mills,* 133 Vt. 15, 19, 328 A.2d 410, 413 (1974).

The defendant next contends that the trial court erred in failing to grant his motion for judgment of acquittal. He argues that the circumstances do not exclude all reasonable hypotheses but that of guilt, as is required when a conviction is based entirely on circumstantial evidence. *State* v. *Benoit,* 136 Vt. 431, 392 A.2d 406, 407 (1978); *State* v. *Angelucci,* 135 Vt. 43, 45, 373 A.2d 834, 835 (1977). The State admits that its case against the defendant is wholly circumstantial. In his brief, the defendant concedes that the trial testimony provides ample support for a jury finding that two people broke into Tom's Pharmacy during the night of July 10, 1977. He claims, however, that the State's evidence is insufficient to support a finding that he was one of those two people.

■ Circumstantial evidence is that proof offered of certain facts and circumstances from which the trier of fact may by way of a process of rational inference conclude that the ultimate fact in dispute did or did not exist. *State* v. *Benoit, supra,* 136 Vt. at 435, 392 A.2d at 408; *State* v. *Angelucci, supra,* 135 Vt. at 45, 373 A.2d at 835. Proof of guilt may be made by circumstantial evidence alone, but to produce that result the circumstances proved must do more than create a mere suspicion of guilt, however strong. Further, the circumstances shown must exclude every reasonable hypothesis except that the defendant is guilty. *State* v. *Benoit, supra,* 136 Vt. at 433, 392 A.2d at 407; *State* v. *Goodhart,* 112 Vt. 154, 158, 22 A.2d 151, 153 (1941). As with other evidence, the credibility of circumstantial evidence and the weight to be given such testimony is a matter for consideration by the jury. See *State* v. *Norton,* 134 Vt. 100, 103, 353 A.2d 324, 326 (1976); *State* v. *Bishop,* 128 Vt. 221, 228, 260 A.2d 393, 398 (1969).

■ To test the propriety of the trial court's denial of the defendant's motion for judgment of acquittal, we must determine whether the evidence when viewed in the light most favorable to

the State fairly and reasonably supports the jury's finding of guilt beyond a reasonable doubt. *State* v. *Benoit, supra,* 136 Vt. at 432–33, 392 A.2d at 407; *State* v. *Bishop,* 127 Vt. 11, 15, 238 A.2d 772, 774 (1968).

 The State's evidence shown by the record and recited in this opinion, if believed by the jury, is so cogent as to exclude every reasonable theory consistent with the defendant's innocence. *State* v. *Levy,* 113 Vt. 459, 461, 35 A.2d 853, 854 (1944). We find no error in the denial of the defendant's motion for judgment of acquittal.

*Judgment affirmed.*