747 P.2d 71

STATE of Idaho, Plaintiff-Respondent,

v.

Nick STREEPER, Defendant-Appellant.

No. 16600.

Supreme Court of Idaho.

Dec. 10, 1987.

Robert L. Crowley, Jr., Rigby, for defendant-appellant.

Jim Jones, Atty. Gen., Boise, Michael A. Henderson, Deputy Atty. Gen. (argued), for plaintiff-respondent.

BISTLINE, Justice.

At about 7:45 a.m. on October 21, 1985, the general manager of Ririe Grain & Feed arrived at his place of work. He noticed a broken window on the north side of the building. After unlocking the door and entering, he heard a crash. He saw that the office had been ransacked. The manager came upon a second broken window, most of the glass from which was on the outside of the building. A police officer later noticed that the shattered glass was stained with fresh blood. One witness, between seven and eight that morning, saw a man running away from the Ririe Grain & Feed building. She described him as being of average height, having long, light colored hair, and wearing a black and white plaid shirt jacket and jeans. A second witness saw a man who looked like he was hurt run north from the building. He described the man as having long hair and wearing some kind of jacket. A third witness, an eleven year old girl, saw a man wearing a jacket and Levis run by the fence of her family's house at about 8 a.m.

A short time later a deputy police officer spotted a yellow Ford Torino in a hay field three-tenths of a mile from Ririe Grain & Feed. The car belonged to a friend of appellant Nick Streeper, who testified that the car was lent to Mr. Streeper to run an errand.

Two bloodhounds handled by the Bonneville County Sheriff's Jeep Patrol assisted the officers in their investigation. At about 11 a.m., one dog, Bonnie, was "scented" by allowing her to sniff around the

Ford Torino. Bonnie followed a trail directly to the broken window at the Ririe Grain & Feed. Later Bonnie was scented with a Levi jacket taken from the Ford Torino. She followed a trail north from the feed store where the witnesses saw the man running earlier in the day. Bonnie followed a trail up to sixty feet from the residence of Mr. Streeper, at which time she was pulled back by the officer because a shepard-type dog was in the area chained to a clothesline. The officer feared that his dog might be attacked.

A second bloodhound, Rebel, was scented at the feed store with the same jacket used with Bonnie. Rebel duplicated Bonnie's trail up to the rear of the Streeper residence. Rebel stopped and sniffed the ground. The officers found a wrecking bar and flashlight partially buried in the ground. Both items were splashed with blood which was later determined to be human.

An officer visited the Streeper residence at 10 a.m., and received no response to his knocking. About an half hour later, two officers came to the house and were permitted to search the house by Streeper's brother. Streeper was found in the darkened basement with his back pressed against the wall. He was wearing a blood-stained blue plaid shirt and had light hair that came down to the middle of his back. One of Streeper's wrists was bleeding from a cut. Taken to the sheriff's office as a suspect, Streeper was given his Miranda warnings. While there, he saw the wrecking bar and flashlight and stated: "Those are mine." He also stated that it was his blood on the crowbar and flashlight.

After a preliminary hearing wherein a magistrate determined probable cause was established, he was held for trial and convicted by jury verdict of burglary in the first degree. I.C. § 18–1401 (1987).[1]

The first issue presented is whether probable cause was established at the pre- liminary hearing. I.C.R. 5.1(b) (Supp.1987) states in pertinent part:

> (b) Probable cause finding. If from the evidence the magistrate determines that a public offense has been committed and that there is probable or sufficient cause to believe that the defendant committed such offense, the magistrate shall forthwith hold him to answer in the district court. The finding of probable cause shall be based upon substantial evidence upon every material element of the offense charged[.]

Streeper argues that the government failed to show any connection, even circumstantial, between himself and the crime charged.

Probable cause exists where "such evidence as would lead a reasonable person to believe the accused party has probably or likely committed the offense charged." *State v. O'Mealey*, 95 Idaho 202, 204, 506 P.2d 99, 101 (1973) (quoting *Martinez v. State*, 90 Idaho 229, 232, 409 P.2d 426, 427 (1965)). "The decision of a magistrate that there exists probable cause to hold a defendant to answer before the district court should be overturned only on a clear showing that the committing magistrate abused his [or her] discretion." *Id.* 95 Idaho at 204, 506 P.2d at 101. *See also Carey v. State*, 91 Idaho 706, 429 P.2d 836 (1967).

At the preliminary hearing the state presented testimony of the witnesses as detailed above, together with a schedule of sunrises and sunsets, and the wrecking bar and flashlight. Significantly, the description of Streeper upon his arrest given by one of the officers generally coincided with the description of two other witnesses of an individual observed running past their home. Consequently, the magistrate did not err in determining that the evidence adduced established probable cause. Moreover, where at a fair trial the accused is found guilty upon sufficient evidence to sustain the verdict, the judgment will not

---

1. Title 18, Chapter 14 of the Idaho Code (1987) provides:

**18–1401. Burglary defined.**—Every person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse, or other building, tent, vessel, closed vehicle, closed trailer, airplane or railroad car, with intent to commit any theft or any felony, is guilty of burglary.

be overturned for defects in proof at the preliminary hearing. *State v. Walker*, 109 Idaho 356, 707 P.2d 467 (Ct.App.1985). *See also State v. Mitchell*, 104 Idaho 493, 660 P.2d 1336 (1983).

Streeper next argues that the evidence is insufficient to support the jury verdict. The standard of review in criminal cases is well settled. A judgment of conviction, entered upon a jury verdict, will not be set aside where there is substantial competent evidence to support it. *State v. Aragon*, 107 Idaho 358, 366 690 P.2d. 293 (1984) (citations omitted). Our function on appeal is to examine the supporting evidence, not to place ourselves in the jury's position or re-weigh the significance of evidence as it relates to specific elements. *State v. Evans*, 102 Idaho 461, 631 P.2d 1220 (1981). Also, a defendant may be convicted solely on circumstantial evidence. *State v. Paradis*, 106 Idaho 117, 676 P.2d 31 (1983), *cert. denied*, 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984).

■ Given the manner in which the burglar apparently entered and exited the feed store, coupled with testimony that the burglar was still in the feed store prior to sunrise, a reasonable inference could be drawn that the wrecking bar and flashlight were instruments of the crime. Also significant were the circumstances of his apprehension with his wrist then bleeding and the questionable explanation that his hand slipped while sharpening a knife. Our review of the record persuades us that the evidence is sufficient to support the jury verdict. The motion for judgment of acquittal was not erroneously denied.

■ It is also urged that a conviction for first degree burglary is not supported, but speculative.[2] At trial the district court took judicial notice that sunrise occurred at 7:51 a.m. on October 21, 1985. The manager upon his arrival heard a big crash. He further testified:

Q. Now, drawing your attention to October 21, 1985, do you recall what time you arrived?

A. Yes. As I came through the door I noticed that the place had been broken into and as I come through the door we have got a great big Pepsi clock hanging up on the wall and I glanced up at it as I was coming through and it was a quarter *after* eight.

Q. How could you tell that it had been broken into?

A. Well, as you walk up to the door—it is all glass in front. There are a lot of windows in front and as I walked up to the door I went to put the key in and I noticed the little north window was broke out on the side. We had had a burglary about two and a half months before that and I thought to myself that oh, we have been broken into and it is always nice to come back on a Monday morning to see.

Q. Mr. Marler, maybe I misunderstood. What time was that again?

A. What time was it?

Q. Yes.

A. A quarter *to* eight.

Q. A quarter *to* eight?

A. Yes.

(Tr., Vol. I, p. 17) (emphasis added). Thus, a reasonable juror could have inferred that the crash, prior to sunrise, was caused by the burglar's escape from the building. Thus, the evidence supports a conviction in the first degree.

■ The final issue presented is the challenge to the use of evidence obtained by utilizing trained bloodhounds, or otherwise put, should testimony of a bloodhound's tracking, and results thereof have been admitted. It is a question not previously addressed by this Court. A survey of the nation's states breaks down into four categories: (a) in thirty states[3] such evidence

---

2. Every burglary committed in the night time is burglary in the first degree. I.C. § 18–1402 (1987). Night time is the period between sunset and sunrise. I.C. § 18–1404 (1987).

3. *Holcombe v. State*, 437 So.2d 663 (Ala.Cr.App. 1983); *Wilkie v. State*, 715 P.2d 1199 (Alaska App.1986); *State v. Roscoe*, 145 Ariz. 212, 700

P.2d 1312 (1984); *Rolen v. State*, 191 Ark. 1120, 89 S.W.2d 614 (1936); *People v. Craig*, 86 Cal. App.3d 905, 150 Cal.Rptr. 676 (1978); *State v. Wallace*, 181 Conn. 237, 435 A.2d 20 (1980); *Cook v. State*, 374 A.2d 264 (1977); *Tomlinson v. State*, 129 Fla. 658, 176 So. 543 (1973); *Smith v. State*, 122 Ga.App. 470, 177 S.E.2d 485 (1970);

is admissible provided that a proper foundation is laid; (b) in five states [1] it is inadmissible under any circumstances; (c) in two states,[5] the question was raised but not decided; and (d) in the remaining thirteen states, Idaho included, the question has not been heretofore addressed.

Professor Wigmore has written of dangers in the use of such evidence:

> ... in actual usage, evidence of the conduct of animals is apt to be highly misleading, to the danger of innocent men. Amidst the popular excitement attendant upon a murder and the chase of the suspect, all the facts upon which the trustworthiness of the inference rests are apt to be distorted in the testimony. Moreover, the very limited nature of the inference possible is apt to be overestimated—a consequence dangerous when the jurors are moved by local prejudice.... The hesitation shown in some courts to the use of this evidence is due to the risks of its misuse by the jury, for in some regions of our country the mysteriously accurate operation of the dogs' senses has given rise to a superstitious faith in the dogs' inerrant inspiration, and this gross popular creed might in a jury mislead them into giving excessive credit to the evidence of the dogs' itinerary.

1A. Wigmore, Evidence § 177 at 1852 (Tillers rev. 1983) (footnote omitted). Streeper urges the Montana rule that bloodhound testimony is incompetent and inadmissible at the trial of any person accused of a crime. *State v. Storm, supra* at n. 4, 125 Mont. 346, 238 P.2d 1161 (1952). The Court of Appeals of Alaska, however, in *Wilkie, supra* at n. 3, observed that the minority view expressed in cases such as *Storm* is based upon, "(1) the unreliability of the dog's motivation; (2) the inability to cross-examine the dog; (3) the hearsay testimony of the handler; and (4) the undue prejudice such evidence has upon the jury." 715 P.2d 1119, 1203 (Alaska App.1986) (quoting *Cook v. State*, 374 A.2d 264, 270 (Del.1977)). The court concluded, nevertheless, that such evidence is admissible provided that foundational prerequisites are adequately established. "We have confidence in the jury's ability to critically evaluate this kind of evidence and give it proper weight." *Id.*

Streeper argues, as some courts hold,[6] that it is impossible to cross-examine a dog, and as a result use of bloodhound testimony violates the Sixth Amendment right to confront a witness. This argument, however, is based on the fallacious premise that the dog is the witness, where in actuality, it is the dog's handler who testifies, explaining the bloodhound's conduct to the jury. We are not persuaded of a Sixth Amendment concern, but we are mindful of the dangers suggested by Professor Wigmore and accordingly lay out the foundational prerequisites much as we did with the use of hypnotized witness testimony in *State v. Iwakiri*, 106 Idaho 618,

*State v. Netherton*, 133 Kan. 685, 3 P.2d 495 (1931); *Daugherty v. Commonwealth*, 293 Ky. 147, 168 S.W.2d 564 (1943); *State v. Green*, 210 La. 157, 26 So.2d 487 (1946); *Commonwealth v. Le Page*, 352 Mass. 403, 226 N.E.2d 200 (1967); *Roberts v. State*, 298 Md. 261, 469 A.2d 442 (1983); *People v. Riemersma*, 104 Mich.App. 773, 306 N.W.2d 340 (1981); *Hinton v. State*, 175 Miss. 308, 166 So. 762 (1936); *State v. Fields*, 434 S.W.2d 507 (Mo.1968); *State v. Rowland*, 263 N.C. 353, 139 S.E.2d 661 (1965); *State v. Iverson*, 187 N.W.2d 1 (N.D.1971), *cert. denied*, 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971); *State v. Dickerson*, 77 Ohio St. 34, 82 N.E. 969 (1907); *Buck v. State*, 77 Okl.Cr. 17, 138 P.2d 115 (1943); *State v. Harris*, 25 Or.App. 71, 547 P.2d 1394 (1976); *Commonwealth v. Hoffman*, 52 Pa.Super. 272 (1913); *State v. Brown*, 103 S.C. 437, 88 S.E. 21 (1916); *Copley v. State*, 153 Tenn. 189, 281 S.W. 460 (1926); *Par-*

*ker v. State*, 46 Tex.Cr.R. 461, 80 S.W. 1008 (1904); *State v. Bourassa*, 137 Vt. 62, 399 A.2d 507 (1979); *Epperly v. Commonwealth*, 224 Va. 214, 294 S.E.2d 882 (1982); *State v. Socolof*, 28 Wash.App. 407, 623 P.2d 733 (1981); *State v. McKinney*, 88 W.Va. 400, 106 S.E. 894 (1921).

4. *People v. Wolf*, 334 Ill. 218, 165 N.E. 619 (1929); *Ruse v. State*, 186 Ind. 237, 115 N.E. 778 (1917); *State v. Grba*, 196 Iowa 241, 194 N.W. 250 (1923); *State v. Storm*, 125 Mont. 346, 238 P.2d 1161 (1952); *Brott v. State*, 70 Neb. 395, 97 N.W. 593 (1903).

5. *Crosby v. Moriarty*, 148 Minn. 201, 181 N.W. 199 (1921); *People v. Whitlock*, 183 App.Div. 482, 171 N.Y.S. 109 (1918).

6. See e.g., *State v. Storm, supra.*

682 P.2d 571 (1984). A proper foundation should show: (1) the dog possesses an acute power of scent determination; (2) the dog was trained to track humans and could do so with a high degree of accuracy; (3) the dog's handler is qualified and experienced; (4) the trail had not become stale or contaminated beyond the dog's competency to follow; (5) the dog was placed on trail at a location where the alleged participant in crime was known to have been.[7] *Wilkie v. State, supra,* 715 P.2d 1199 (Alaska App. 1986); *State v. Wilson,* 180 Conn. 481, 429 A.2d 931 (1980); *People v. Harper,* 43 Mich.App. 500, 204 N.W.2d 263 (1972); *People v. Centolella,* 61 Misc.2d 726, 305 N.Y. S.2d 460 (1969), *supra* at n. 3; *State v. Rowland, supra* at n. 3, 263 N.C. 353, 139 S.E.2d 661 (1965). Annot., 18 A.L.R.3d 1221 (1968).

Testimony at trial was that Michael Gates, Rebel's trainer, worked with the dog for six years and was a member of the National Police Bloodhound Association. Rebel was a registered purebred bloodhound and had received tracking dog certificates from the American Kennel Club. Rebel was trained to track only humans and had been used in about fifty actual cases with a success rate of 80 percent.

Similarly, Bonnie's trainer, James Colvin, acquired Bonnie for the jeep patrol when the dog was a pup and trained Bonnie at least once a week for nine years. He was assisted and instructed to work with Bonnie by another individual who had handled hounds for many years. Bonnie, also a registered pureblood, had been used in over one hundred cases with a success rate of about 75 percent. Both dogs were scented and placed on a trail, within three to five hours after the burglary, near where the witnesses saw the man running north from the Ririe Grain & Feed. In the past they had followed trails as old as five days and were regularly trained to follow trails between four and twenty-four hours old. In light of the testimony given by the dogs' trainers, we find that a sufficient foundation was established.[8]

Here as set out above there was evidence independent of that obtained by use of the bloodhounds which incriminated Streeper. The testimony of the dog handlers was admissible corroborating evidence of Streeper's involvement in the burglary. The judgment of conviction is therefore *affirmed.*

SHEPARD, C.J., and BAKES and HUNTLEY, JJ. concur.

DONALDSON, J., sat, but did not participate due to his untimely death.

---

**7.** These foundational requirements are applicable in situations where dogs have tracked humans. We express no opinion as to the evidentiary requirements in cases where, for example, dogs have detected explosives in buildings or drugs in luggage; these questions are left for another day.

**8.** We are also brought to the belief that a conviction cannot be based solely on such evidence but such evidence is to be used as corroboration. Standing alone it will be insufficient to support a conviction. *State v. Nicholas,* 34 Wash.App. 775, 663 P.2d 1356 (1983). Also, when a request is made by defense counsel, the trial court should include a cautionary instruction. Wilkie, *supra,* 715 P.2d at 1203, n. 3. In this case, the following instruction was submitted to the jury: "Evidence of tracking by bloodhounds or other trained dogs should be subject to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such evidence alone."